HATCH, JAMES & DODGE, P.C..
Mark F. James (Utah Bar No.5295)
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

RYAN & MANISKAS, LLP
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel: (484) 588-5516
Fax: (484) 450-2582

SAXENA WHITE P.A.
Joseph E. White III
Lester R. Hooker
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PAUL SIESSER, Individually and on behalf of all others similarly situated,<br><br>                       Plaintiff,<br>v.<br><br>NU SKIN ENTERPRISES INC, RITCH N. WOOD, and M. TRUMAN HUNT,<br><br>                       Defendants, | **CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Case No.<br><br>Judge |

Plaintiff Paul Siesser ("Plaintiff") brings this securities class action pursuant to §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired Nu Skin Enterprises, Inc. ("Nu Skin" or the "Company") securities between July 10, 2013 and January 16, 2014, inclusive (the "Class Period"). The allegations herein are based upon Plaintiff's knowledge with respect to Plaintiff, and information and belief as to all other matters, based

upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and press releases, Nu Skin's public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding Nu Skin, securities analysts' reports and advisories about the Company, transcripts of Nu Skin investor conference calls, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This action arises from Nu Skin's failure to disclose its fraudulent sales practices and non-compliance with Chinese laws and regulations.

2.      Through the Nu Skin and Pharmanex brand names, Nu Skin purports to manufacture and distribute skin care and nutrition products in fifty-three markets worldwide including North Asia, the Americas, Greater China, Southeast Asia/Pacific, and Europe.

3.      Direct selling companies like Nu Skin engage in the marketing and selling of products directly to consumers without using traditional mass media advertising and/or direct marketing campaigns—primarily using person-to-person marketing to promote and sell products. Personal marketing efforts are supported by various mediums including catalogs and the Internet. Sales distributors for direct selling companies are encouraged to recruit more people to join in the network, with commissions and/or bonuses offered as incentives. The Company's business model offers a global sales compensation plan; incentivizing sales leaders to establish sales organizations and consumer bases in each country Nu Skin conducts business.

4.     However in China, one of Nu Skin's leading markets, the Company claims to operate under a different business and sales compensation model as direct selling is heavily regulated. Sales and success in China is vitally important, as the Company depends on China for a significant amount of its revenue and growth. For example, according to Nu Skin's 3Q 2013 financials, China accounted for $464.6 million of the Company's revenue.

5.     Throughout the Class Period, Nu Skin repeatedly stressed that China is a "growing market for the direct selling industry," "hold[ing] great promise" and "represent[ing] a significant opportunity to expand [Nu Skin's] business."

6.     Nu Skin touted the strength of its operations in China, however in reality the Company's success could not be sustained as local Chinese law and regulations were violated through its business practices. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's operations in the People's Republic of China ("PRC") resulted in pyramid selling schemes in violation of PRC law; and (ii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

7.     On January 15, 2014 investors were shocked by reports that Nu Skin engaged in an illegal pyramid scheme. Specifically, the Chinese newspaper *People's Daily* accused Nu Skin of lying about its business in China. The article stated that the Company had been exaggerating its influence and creditworthiness in Nu Skin brochures and organizing "brainwashing" gatherings. In response, China's State Administration for Industry and Commerce ("SAIC") and the Ministry of Commerce ordered investigations into Nu Skin's practices.

8.     The following day, the Company acknowledged that Chinese regulators had indeed initiated their investigations and that Nu Skin's China revenue could be negatively impacted.  Nu Skin admitted that they were unaware as to whether previous guidance will be affected.

9.     Investors were stunned by this news of the China investigations.  Overall, the share price of Nu Skin common stock sank over $57 per share in the aggregate, or approximately 42% over the three trading sessions after various reports surfaced.  Shares of Nu Skin closed on January 15, 2014 at $115.23, down from $136.47 on January 14, 2014.  Nu Skin shares further plunged 26% to a closing price of $84.80 on January 16, 2014.  On January 17, 2014, Nu Skin shares fell further to a closing price of $79.47 for an approximate loss of 7%.  This massive stock price decline wiped out approximately $3.5 billion in the Company's market capitalization on unusually heaving trading volume.

10.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.  Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Nu Skin has operations in this District, false statements were made in this District, and acts giving rise to the violations complained of occurred in this District.

12.     In connection with the acts alleged in this Complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

**PARTIES**

13.     Plaintiff acquired Nu Skin common stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

14.     Defendant Nu Skin is a Utah-based global direct selling company that offers anti-aging personal care products and nutritional supplements in 53 markets worldwide.   The Company was incorporated under the laws of the State of Delaware, and maintains principal executive offices at 75 West Center Street Provo, Utah 84601.

15.     Defendant M. Truman Hunt ("Hunt") is the President and Chief Executive Officer ("CEO") of the Company, since 2003.  Defendant Hunt is also a director of the Company.  Hunt joined Nu Skin in 1991 and has served in various positions, including Vice President and General Counsel from 1996 to 2003 and Executive Vice President from 2001 until 2003.  Hunt Wood certified the Company's materially false and misleading quarterly reports on Forms 10-Q for the second and third quarters of 2013, filed with the SEC on August 5, 2013 and November 6, 2013, respectively.

16.     Defendant Ritch N. Wood ("Wood") is Chief Financial Officer ("CFO") of the Company and has served in such capacity since 2002.  Since 1997 Wood has worked at Nu Skin, serving in various roles such as vice president of finance, vice president new market development and director of finance new market development. Wood signed and certified the

Company's materially false and misleading quarterly reports on Forms 10-Q for the second and third quarters of 2013, filed with the SEC on August 5, 2013 and November 6, 2013, respectively.

17.     Defendants Hunt and Wood (collectively, the "Individual Defendants") possessed the power and authority to control the contents of Nu Skin's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## BACKGROUND

18.     Nu Skin is one of the 10 largest direct selling companies, operating in fifty-three markets worldwide.  The Company develops and distributes anti-aging personal care products and nutritional supplements. Nu Skin distributes their products primarily through direct selling, without traditional mass media advertising or direct marketing campaigns. Nu Skin purports that its most significant asset is its global network of distributors and consumers who enable the Company to introduce products and penetrate new markets with modest upfront promotional expenses.

19.     According to Nu Skin's 2012 annual report on Form 10-K, 89% of the Company's 2012 revenue came from outside of the United States.  China accounted for 12% of Nu Skin's total 2012 revenue at $264.8 million.

20.     In China, the Company purportedly offers a variety of Nu Skin products as well as a locally produced value line of personal care products under the *Scion* brand name.  Nu Skin also sells a select number of Pharmanex products in China, including Nu Skin's number one nutritional product, *LifePak.*

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

21.     The Class Period begins on July 10, 2013, the first day of trading after Nu Skin issued a press release announcing its purported second quarter 2013 earnings results and raised 2013 guidance.  The Company significantly increased its estimated revenue to $680 million from a prior revenue guidance of $570 to $580 million.

22.     Additionally, the Company announced that it was increasing its full-year 2013 revenue guidance by $320 million from $2.83 to $2.86 billion, including a negative 5 percent impact from foreign currency fluctuations.  The Company also stated that it expected 2013 earnings to be $4.85 to $5.00 per share.

23.     Commenting on these results, Defendant Hunt stated: "Our second-quarter results reflect the strong momentum of our business... After a record 2012 that included impressive ageLOC product launches in the second quarter, *we continue to generate healthy gains*

*throughout our global business, particularly in the Greater China,*[1] North Asia and Americas regions."

24.     On July 18, 2013, Nu Skin announced that it received direct selling authorization in five additional provinces and thirty districts in China.  Specifically, Defendant Hunt stated: "We believe the government's approval of our application is a reflection of our significant investment in China over the past several years, our commitment to enhancing the lives of China's consumers and our desire to be a constructive part of China's social framework."

25.     Defendant Hunt added the following: "We continue to build for the long-term potential of this important market and these new licenses allow us to further expand our direct selling coverage.  Additionally, in an effort to better support our sales force and consumers in China, we are accelerating our infrastructure plans, including tripling the number of stores and sales support centers by 2015, as opposed to 2017 as previously announced, and expanding our manufacturing capabilities within the market by the end of 2013."

26.     On August 1, 2013, the Company issued a press release reporting its second quarter results with revenue of $682.9 million, a 15 percent increase over the prior-year period. In addition, quarterly earnings per share increased 30 percent to $1.22 from $0.94 in the prior year.

27.     In the August 1, 2013 Press Release Defendant Hunt touted the strong momentum of Nu Skin's business, stating: "Overall, we saw healthy trends throughout the global business, particularly in the Greater China, North Asia and Americas regions."  In regards to China, the Company reported the following:

---

[1] Unless otherwise indicated, all emphasis is added.

> *In Greater China, second-quarter revenue increased 35 percent to $269.1 million, compared to $199.7 million in the prior year, which included approximately $100 million in product launch revenue.* The region's results were negatively impacted 3 percent by foreign currency fluctuations. The sales leader count in the region improved 51 percent, while the number of actives increased 121 percent compared to the prior year.

28.    Nu Skin also held a quarterly results conference call on August 1, 2013.  During this call, the Individual Defendants noted the impact of China on the Company's strong results. The Individual Defendants touted the Company's revenue growth and positive results for the second quarter.  In particular, Defendant Hunt stated the following in regards to the Company's business, expansion and growth in China:

> Turning our attention to a few geographic markets. *Greater China's growth obviously continues to be very strong.* Sales in the second quarter in Mainland China were $198 million. And as we announced a few weeks ago, we're pleased that China recently approved 5 additional direct-selling licenses, which will become increasingly important as our business develops throughout China. *We continue to invest to sustain growth in this market and are committed to working to ensure our long-term success there. From what we're seeing, we believe that the market continues to have significant upside potential.*
>
> * * * *
>
> In Shanghai, we are building a Greater China headquarters, which is also quite large in scale and will enable us to have enough infrastructure to continue to grow there for some time. It includes manufacturing facilities, warehousing facilities, office facilities, as well as a recognition center for China sales leaders. It, too, will be a real showpiece and will attract a lot of our sales leaders from around the Greater China region who will be proud of that. So we'll be into that facility in the December, January timeframe and are equally excited to be moving into that one.

29.    Defendant Wood also acknowledged the Company's prospect and business in China, stating the following:

> *And then we have this incentive that we've talked about in our Greater China region that if the Greater China region achieves $1 billion, there's a special incentive that we put in place back in 2009 that would pay out. At this point in time, we're highly confident and obviously on the track we're on now we'll*

*exceed that $1 billion target this year. So we're accruing to hit that number that pushed our selling expenses up just a little bit.* We have more people in qualification, more people qualifying to hit sales incentive targets, kind of trip incentives and promotional incentives that we put in place, which has also pushed the incentive up just a little bit. The way we really calibrate that through is that the faster growth helps us to leverage our overhead as well. So the growth in selling expenses is offset in the overhead number, which allows us to continue to improve margins as we go forward.

30.    On August 5, 2013, Nu Skin filed its quarterly report for the second quarter of 2012 on Form 10-Q ("2Q 2012 10-Q") with the SEC signed by Defendant Wood.

31.    In the Form 10-Q, Hunt and Wood falsely certified that Nu Skin's 2Q 2012 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations.

32.    On October 22, 2013, Nu Skin issued a press release discussing its record third quarter 2013 financial results and raising its 2013 guidance. The Company reported record third-quarter results with revenue of $927.6 million, a 76 percent increase over the prior-year period. Earnings per share for the quarter were $1.80, a 107 percent year-over-year improvement.

33.    Commenting on the Company's strong third quarter 2013 results, Defendant Hunt stated that "[t]he momentum [the Company] ha[s] established in the first half of the year has accelerated as we posted gains throughout the world, ***with particularly impressive results in the Greater China*** and South Asia/Pacific regions, as well as South Korea."

34.    Also on October 22, 2013, the Company held a conference call where Defendants Hunt and Wood again touted the importance of the Chinese market to the Company's future. In particular, Defendant Hunt stated:

Geographically, we were particularly pleased with the strong growth in the Greater China and South Asia/Pacific regions, as well as in South Korea and in the Americas. *We remain optimistic about the potential of Mainland China, which continues to be a growing market for the direct selling industry as a whole.* We're still a relatively small player in the market and we think that the market's potential justifies the investment to continue to sustain growth in a market that one really cannot afford to ignore.

We've spoken previously about our plans to accelerate the build-out of our business in China and look forward to sharing an update and more details of this plan in November at our Analyst Day.

I would also note that the other markets in the Greater China region also performed extremely well this quarter, with a 79% improvement in Taiwan, 68% improvement in Hong Kong.

Some of you will remember that about 3 years ago, we put in place an incentive for Greater China to reach $1 billion in sales by the end of 2014, which is our 30th anniversary year. That objective, when we initiated it, it seemed quite aspirational at the time. *But we will announce this week at our convention that Greater China actually achieved that sales objective for the year earlier in the month of October. So we're really pleased with what's happening there, and that achievement is a tribute to our management team and our sales leaders who are working really hard to execute in a high growth environment.*

35.     Defendant Wood also highlighted the Company's success in China:

As we mentioned, overall sales grew 76%, which included a 3% currency -- negative currency impact. Revenue in the quarter benefited from $205 million approximately of LTO sales, and which was approximately $15 million ahead of our estimate of $190 million. In the prior year quarter, we had about $50 million of LTO sales in Greater China and Southeast Asia.  Our gross margin for the quarter was 84.9%. That was well ahead of our expectations and up about 140 basis points compared to the prior year, 83.5% rate. The lift in gross margin was primarily attributed to the LTO sales of TR90 products, which on a consolidated basis have very good gross margins in Asia, which is where the LTO took place.

36.     On November 6, 2013, Nu Skin filed its quarterly report for the third quarter of 2013 on Form 10-Q with the SEC signed by Defendant Wood.  The Form 10-Q reported financial results substantially similar to the results provided in the October 22, 2013 press release.

37.     In the Form 10-Q, Hunt and Wood also signed certifications that falsely stated that Nu Skin's third quarter 2011 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations.

38.     The statements above are false and misleading because Defendants misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (i) the Company was operating an illegal Chinese pyramid scheme in violation of Chinese law and (ii) as a result of the above, the Company's financial statements, assurances and expectations with regard to the Company's growth, operations and business prospects were false and misleading at all relevant times.

## THE TRUTH EMERGES

39.     On January 15, 2014, the Chinese newspaper *People's Daily* accused Nu Skin of lying about its business in China.  The article stated that the Company had been exaggerating its influence and creditworthiness in Nu Skin brochures and organizing "brainwashing" gatherings. The newspaper also stated that the Company sells 104 products in China, 20 more than the government allows.

40.     The Company issued a statement in response to the People's Daily article, with Defendants still attempting to guise their illegal pyramid scheme.  Nu Skin stated the following:

> "The article that appeared in today's *People's Daily* contains inaccuracies and exaggerations that are not representative of Nu Skin's business in China.  The reporters did not attempt to verify any information with Nu Skin. We do not believe that the article was the result of any particular government inquiry.

> "We are dedicated to operating in full compliance with applicable regulations as interpreted and enforced by the government of China. Nu Skin has an 11-year

12

history of doing business in China under these regulations. Our business activities are regularly monitored by the government in this rapidly growing marketplace. As is our practice, we will communicate openly with regulators to address questions arising from this article.

"Nu Skin has government-approved direct selling licenses to operate in a majority of provinces in China. The most recent government licensure in July further expanded our direct selling footprint to include 19 of the country's 32 provinces.

"We actively educate our sales force to follow all regulations as well as company policies and procedures, and any member of our sales force not operating in accordance with local law or with our company policies is subject to discipline."

41.     In response to the *People's Daily* article, the SAIC and the Ministry of Commerce ordered investigations into Nu Skin's practices.   The State Administration for Industry and Commerce is treating the allegations seriously, stating on its website that: "[i]f the situation proves to be true, the commerce department will deal with it according to the law and regulations."

42.     The next day, the Company issued a press release regarding the Company's Chinese business and was forced to acknowledge that Chinese regulators had indeed begun investigations relating to the issues raised in the recent news reports.  Nu Skin claimed that the Company was cooperating with the investigations and admitted that Chinese revenue would likely be negatively impacted; however the Company could not address whether previous guidance would be affected.  Specifically, the Company stated that:

"We are aware that Chinese regulators have now initiated investigations to review issues raised by recent news reports. The government regularly monitors all businesses in this rapidly growing marketplace, and as is our practice, we will continue to communicate openly with regulators to address any questions they may have.

"As part of our ongoing commitment to comply with all applicable Chinese regulations, we have initiated our own province-by-province business review and will invite relevant regulators to provide guidance. Given the substantial growth

13

in our China salesforce over the last year, we are also taking additional steps to reinforce our training and education efforts. As we work through this evolving situation and remain focused on long-term growth, there will likely be a negative impact on China revenue, but it is too early to know whether our previous guidance will be affected.

"We remain committed to working cooperatively with the government to ensure long-term, sustainable growth in this important market. Nu Skin has an 11-year history of doing business in China. We are dedicated to operating in full compliance with all applicable regulations as interpreted and enforced by the government of China."

43.    Further exemplifying the issues at Nu Skin, on January 17, 2014, Bank of America Merrill Lynch analyst Olivia Tong downgraded the Company from buy to neutral.

44.    Investors were stunned by this news of the China investigations. Overall, the share price of Nu Skin common stock sank over $57 per share in the aggregate, or approximately 42% over the three trading sessions after these reports surfaced.  Shares of Nu Skin closed on January 15, 2014 at $115.23, down from $136.47 on January 14, 2014.  Nu Skin shares further plunged 26% to a closing price of $84.80 on January 16, 2014.  On January 17, 2014 Nu Skin shares fell further to a closing price of $79.47 for an approximate loss of 7%.

45.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

**CONTINUED REVELATION OF CHINESE PYRAMID SCHEME**

46.     News reports and analysts continue to scrutinize and reveal the severity of Nu Skin's illegal business practices in China.

47.     In a January 18, 2014 Seeking Alpha article entitled "Nu Skin, An American Pyramid in China?" the following was stated in regards to Nu Skin's pyramid practices:

> *With just a cursory look at Nu Skin in China, it is impossible not to see evidence of MLM's hallmark "infinite expansion" promise with mass gatherings in China in which the followers, according to some Chinese officials, appear "brainwashed."* Traditional door-to-door selling with rewards based only on one's own personal sales seldom engenders such passion, while the electrifying promise of "unlimited income" ignites fanatical zeal wherever it is delivered. *It is similarly difficult to explain Nu Skin's rapid sales revenue growth in China based only on its dubious "anti-ageing" products, of which there are many others in China.*
>
> *But perhaps the strongest evidence that Nu Skin would have great difficulty changing its stripes in China is the company's militant defense of its pyramid model right here in the USA where the model is also challenged.* Nu Skin might have made the bad call to ignore China's anti-pyramid laws because Nu Skin officially rejects the US government's definition of a pyramid scheme for its operations at home. And it has, so far, paid no price for this flouting.
>
> \* \* \* \*
>
> Nu Skin bolstered its convoluted explanation to investors about retail sales and classifications of contractors by also assigning new definitions to the sales transactions within the distribution channel. Nu Skin informed investors that some of its third party contract sales are actually "direct sales" made only between the company as seller and the contractor as buyer. Nu Skin characterized purchases made by some of the salespeople as "buying directly" from the company. However, in fact, Nu Skin does not sell "direct." It has no in-house sales force. Sales are made through independent distributors. On *every* sale that is made to a distributor or a "preferred customer" (Nu Skin has never revealed how many of these there are) a commission is paid to an entire chain of other distributors who are credited with making the sale. In all the world, this is called *distributor sales*, not direct sales. No company pays commissions to a "third party" for sales the company made "directly."

15

*Now, in the public glare of regulatory investigation, Nu Skin must explain to China how its current model and practices in that country are not "multi-level." This may prove harder in China than making the smoke and mirrors PowerPoint explanation for "retail sales" and "direct sales" in the USA. America has no explicit law against pyramid schemes, facilitating the current confusion and regulatory reticence. China, however does have such a law, the strictest in the world.* Here is some of the ominous text of the law.

*Article 7*

*The following acts belong to the pyramid selling:*

*(1) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling, calculating and paying remunerations (including material awards and other economic interests, the same below) to the recruiters on the basis of the number of persons a recruiter has directly or indirectly recruited in a rotating way;*

*(2) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling and asking the recruiters to pay fees explicitly or in any disguised form like purchasing commodities for obtaining the qualification for participating in pyramid selling or recruiting others to participate in pyramid selling; and*

*(3) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling so as to form a multi-level relationship, and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoters below.* (emphasis included).

It may require much more than a fancy PowerPoint presentation for Nu Skin to talk its way out of a China investigation.

48.     In a January 21, 2014 *Reuters* article entitled "Nu Skin to halt China distributor recruitment after probe," it was revealed that a Company internal investigation found that some distributors had failed to adequately follow and enforce the company's policies and regulations. The article revealed the following information:

> Skincare products maker Nu Skin Enterprises Inc said ***it would suspend promotional meetings in China where it recruits new distributors, days after Chinese regulators launched investigations into its business practices.***
>
> ***An internal investigation found that some distributors had failed to adequately follow and enforce the company's policies and regulations***, Nu Skin said in a letter to its customers on Tuesday.
>
> ***"We sincerely apologize for these unfortunate and unauthorized activities."***
>
> ***The company also said it would take corrective actions, including further training of its employees in China.***
>
> Chinese regulators started investigations into Nu Skin last week after local media accused it the company of exaggerating its influence and creditworthiness in brochures and organizing "brainwashing" gatherings.
>
> Nu Skin's shares lost a third of their value on Thursday, after news of the investigation broke. Shares of Herbalife Ltd , which has a business model similar to Nu Skin, fell 10 percent the same day.
>
> Short sellers and critics have accused companies such as Nu Skin and Herbalife of running illegal pyramid-type schemes, questioning their distribution model where distributors make money not only from their own sales, but also from those they recruit to become distributors themselves.
>
> \* \* \* \*
>
> Nu Skin said on Tuesday it would continue to sell products through its existing distributors in China. It would also extend its product refund policy to them.
>
> The company allows distributors to return products within 12 months of purchase for a refund after deducting 10 percent of the cost as restocking fee, according to a regulatory filing.

*Nu Skin also said its training will now aim at stopping sales executives from inaccurately attributing endorsements to public figures or media reports, exaggerating product claims and improperly describing Nu Skin's business model in China.*

49.     In a January 21, 2014 *Seeking Alpha* article entitled "Nu Skin Falls Under Media Microscope," the commentator found some truth to the accusations in the People's Daily article, stating:

> All that brings us back to the original issue, which is why I think this crackdown on Nu Skin and others like it are at least partly deserved. *For starters, pyramid schemes are illegal in China, and are actually illegal in many other countries also. Nu Skin and others argue that they don't encourage the recruitment of new salespeople as a way to earn money, but the reality remains that this kind of practice is probably quite common and is one of the big attractions of working for companies like Nu Skin.*
>
> More broadly speaking, I really think this kind of aggressive selling is unfair, especially to Chinese consumers who often put too much trust in products with foreign brand names. I do think that this kind of business model should be allowed if it doesn't violate any laws. But I also believe that legal curbs should be put on sales tactics, and Beijing should launch a broader educational campaign to teach Chinese consumers how to say "no" when they get approached by aggressive salespeople peddling products they don't really want or need.

## SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Nu Skin, their control over, and receipt or modification of Nu Skin's allegedly materially misleading statements, and their associations with the Company which made them

18

privy to confidential proprietary information concerning Nu Skin, participated in the fraudulent scheme alleged herein.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE AND MATERIAL OMISSIONS

51.     Plaintiff asserts two bases for a presumption of reliance in this action.  First, the material omissions are presumed to have inflated the market prices of Nu Skin common stock under the presumptions stated in *Affiliated Ute. Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Second, at all relevant times, the market for Nu Skin common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

52.     Throughout the Class Period, Nu Skin common stock has traded on NYSE, an efficient market that promptly digested current information with respect to Nu Skin from publicly available sources and reflected such information in the prices of Nu Skin's shares.

53.     The evidence that Nu Skin common stock traded on an efficient market at all relevant times includes the following:

      i.     Nu Skin common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      ii.    As a regulated issuer, Nu Skin filed periodic public reports with the SEC and the NYSE;

     iii.   During the Class Period, Nu Skin was followed by multiple securities analysts who wrote reports about Nu Skin that were distributed to their

clients.   Each of these reports were publicly available and entered the public marketplace;

iv.     Nu Skin regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

v.      Nu Skin securities were liquid and traded with moderate to heavy volume during the Class Period.

54.     Based on these indicia, a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

55.     During the Class period, as alleged herein, Defendants engaged in a scheme to deceive the market, making materially false and misleading statements and omissions. Defendants presented a misleading picture of Nu Skin's business and prospects.   Instead of truthfully disclosing during the Class Period that Nu Skin was engaged in misconduct in China, Defendants falsely reported Nu Skin's financial condition and outlook.

56.     Defendants' false and misleading statements had the intended effect and caused Nu Skin's stock to trade at artificially inflated levels throughout the Class Period—before the start of the Class Period from less than $70 per share to a high of approximately $140 per share by the end of the Class Period.

57.    As alleged herein, the truth about Nu Skin's overstatement of its financial condition and outlook began on January 15, 2014.  Overall, the share price of Nu Skin common stock sank over $57 per share in the aggregate, or approximately 42% over the three trading sessions after these reports surfaced.  Shares of Nu Skin closed on January 15, 2014 at $115.23, down from $136.47 on January 14, 2014.  Nu Skin shares further plunged 26% to a closing price of $84.80 on January 16, 2014.  On January 17, 2014 Nu Skin shares fell further to a closing price of $79.47 for an approximate loss of 7%.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint.   Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Nu Skin who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

59.  Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise

acquired Nu Skin common stock during the period between July 10, 2013 and January 16, 2014, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are Defendants, other officers and directors of Nu Skin at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

60.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nu Skin common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nu Skin or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.   The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.  At all relevant times, Nu Skin had over 59 million shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

62.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nu Skin;

- whether the Individual Defendants caused Nu Skin to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nu Skin common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.     Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

64.     Plaintiff will adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE
### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

66.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

67.     Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Nu Skin, Wood and Hunt.

68.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

     a.     employed devices, schemes and artifices to defraud;

     b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     c.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nu Skin common stock during the Class Period.

70.     By virtue of their positions at Nu Skin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executive

managers and/or directors of Nu Skin, the Individual Defendants had knowledge of the details of Nu Skin's internal affairs.

72.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nu Skin.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nu Skin's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nu Skin securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Nu Skin's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nu Skin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nu Skin common stock.  Plaintiff and the other members of the Class would not have purchased Nu Skin common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO
### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

74.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

75.     Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

76.     The Individual Defendants, by virtue of their executive leadership positions in Nu Skin, had the power and authority to cause Nu Skin to engage in the wrongful conduct complained of herein, and to control the contents of Nu Skin's annual and quarterly reports and press releases.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

77.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nu Skin's financial condition and results of operations, and to correct promptly any public statements issued by Nu Skin which had become materially false or misleading.

78.     Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nu Skin disseminated in the marketplace during the Class Period concerning Nu Skin's results of operations.  Each of the Individual Defendants exercised control over the general operations of Nu Skin, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  The Individual Defendants therefore, were "controlling persons" of Nu Skin

within the meaning of Section 20{a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nu Skin securities.

79.     Nu Skin violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

80.     By reason of their control of Nu Skin, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Nu Skin's violations of Section 10(b) and Rule 10b-5, to the same extent as Nu Skin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the other members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding Plaintiff such other or further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of the Class, hereby demands a trial by jury.

Dated: February 4, 2014

**HATCH, JAMES & DODGE**

By: _____

Mark F. James
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

**SAXENA WHITE P.A.**

Joseph E. White III
Lester R. Hooker
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone:  (561) 394-3399
Facsimile: (561) 394-3382

**Ryan & Maniskas, LLP**

Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

*Counsel for Plaintiff*